Reuven L. Cohen (Bar No. 231915)
Email: rcohen@cohen-williams.com
COHEN WILLIAMS LLP
724 South Spring Street, 9th Floor
Los Angeles, CA 90014
Telephone: (213) 232-5160
Facsimile: (213) 232-5167

Specially Appearing Attorney for Defendant
Paul Richard Randall

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

   v.

PAUL RICHARD RANDALL,

Defendant.

Case No. 2:25-mj-3689

**DEFENDANT PAUL RICHARD RANDALL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS APPLICATION FOR RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE OR DETENTION**

*Filed concurrently with Declaration of Reuven L. Cohen*

Judge:  Hon. Brianna Mircheff
Date:   July 8, 2025
Time:   1:00 p.m.

COHEN WILLIAMS LLP

Defendant PAUL RICHARD RANDALL, by and through his specially appearing attorney Reuven L. Cohen, hereby submits the attached memorandum of points and authorities in support of his application for reconsideration of an order setting conditions of release or detention.  (Dkt. No. 7.)  Mr. Randall bases his memorandum on the files and records in this case and any other evidence or argument that the Court may consider.

Dated:  July 7, 2025                    **COHEN WILLIAMS LLP**


By: _____/s/ Reuven L. Cohen_____
Reuven L. Cohen
Specially Appearing Attorney for Defendant
Paul Richard Randall

DEFENDANT PAUL RICHARD RANDALL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
HIS APPLICATION FOR RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE OR DETENTION

## **TABLE OF CONTENTS**

I.      INTRODUCTION..........................................................................................1

II.     PROCEDURAL BACKGROUND ...............................................................3

III.    LEGAL STANDARD ..................................................................................6

IV.     ARGUMENT................................................................................................8

      A.      Mr. Randall's New Bond Proposal and Additional Information About His Medical Needs and Conditions of Confinement Warrant Reconsideration of Bail. ...........................................................................8

      B.      The Government Is Not Entitled to Request Detention Because Mr. Randall Does Not Pose a Serious Risk of Flight....................................10

      C.      Mr. Randall Does Not Pose a Danger to the Safety of the Community...................................................................................................18

      D.      Detaining Mr. Randall in His Current Physical Condition Violates His Right to Counsel and Right to Due Process. .........................................20

      E.      In the Alternative, Mr. Randall Should Be Released Pursuant to 18 U.S.C. § 3142(i). ...................................................................................24

V.      CONCLUSION...........................................................................................25

DEFENDANT PAUL RICHARD RANDALL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS APPLICATION FOR RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE OR DETENTION

# TABLE OF AUTHORITIES

**Cases**

*Bell v. Wolfish*,
441 U.S. 520 (1979)....................................................................................21

*Ching v. Lewis*,
895 F.2d 608 (9th Cir. 1990) ......................................................................22

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,
489 U.S. 189 (1989).....................................................................................21

*Holloway v. Arkansas*,
435 U.S. 475 (1989).....................................................................................21

*Stack v. Boyle*,
342 U.S. 1 (1951).........................................................................................16

*United States v. Bernal*,
183 F. Supp. 2d 439 (D.P.R. 2001)............................................................20

*United States v. Byrd*,
969 F.2d 106 (5th Cir. 1992) ........................................................................7

*United States v. Caro*,
No. 05 CR 858, 2005 WL 8160735 (N.D. Ill. Nov. 2, 2005)....................11

*United States v. Chen*,
820 F. Supp. 1205 (N.D. Cal. 1992).............................................................6

*United States v. Dodge*,
842 F. Supp. 643 (D. Conn.)........................................................................12

*United States v. Friedman*,
837 F.2d 48 (2d Cir. 1988)....................................................................7, 15

*United States v. Garcia*,
No. CR 13-0601-JST (KAW), 2014 WL 1478902 (N.D. Cal. Apr. 14, 2014) .............15

*United States v. Garrett*,
179 F.3d 1143 (9th Cir. 1999) ....................................................................21

*United States v. Giordano*,
370 F. Supp. 2d 1256 (S.D. Fla. 2005) ...........................................11, 15, 17

*United States v. Himler*,
797 F.2d 156 (3d Cir. 1986)..............................................................7, 17, 18

*United States v. LaLonde*,
246 F. Supp. 2d 873 (S.D. Ohio 2003) ................................................16, 18

*United States v. Madoff*,
586 F. Supp. 2d 240 (S.D.N.Y. 2009) .................................................18, 19

*United States v. Mercado*,
737 F. Supp. 3d 153 (W.D.N.Y. 2024)........................................................18

*United States v. Molina-Orantes*,
No. 3:25-CR-00079-AN, 2025 WL 1177654 (D. Or. Apr. 23, 2025)..........12

*United States v. Motamedi*,
767 F.2d 1403 (9th Cir. 1985) ...........................................................*passim*

*United States v. Orozco,*
  No. 2:18-CR-00104-KJM, 2020 WL 2745694 (E.D. Cal. May 27, 2020)...................10

*United States v. Orta,*
  760 F.2d 887 (8th Cir. 1985) ...............................................................................6, 8

*United States v. Ploof,*
  851 F.2d 7 (1st Cir. 1988) ........................................................................................7

*United States v. Russe,*
  No. 10 CR 328-1, 2012 WL 3308623 (N.D. Ill. Aug. 13, 2012)...............................20

*United States v. Salerno,*
  481 U.S. 739 (1987)..................................................................................................6

*United States v. Townsend,*
  897 F.2d 989 (9th Cir. 1990) ..................................................................................11

*United States v. Ward,*
  63 F. Supp. 2d 1203 (C.D. Cal. 1999) ......................................................................9

*United States v. Wasendorf,*
  No. CR12-2021, 2012 WL 4052834 (N.D. Iowa Sept. 13, 2012)............................10

*United States v. Xulam,*
  84 F.3d 441 (D.C. Cir. 1996) ..................................................................................11

**Statutes**

18 U.S.C. § 3142(b) ......................................................................................................7

18 U.S.C. § 3142(c) ..................................................................................................7, 8

18 U.S.C. § 3142(f).............................................................................................*passim*

18 U.S.C. § 3142(i) ...............................................................................................24, 25

18 U.S.C. § 3142(j) ....................................................................................................16

18 U.S.C. § 3145(b) ......................................................................................................8

18 U.S.C. §3143(f)........................................................................................................9

**Miscellaneous**

U.S. Dep't of Justice, Office of the Inspector General Audit Division,
  *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*,
  (March 2016)...........................................................................................................23

Meg Anderson, *1 in 4 Inmate Deaths Happens in the Same Federal Prison.
  Why?*, NPR (Sept. 23, 2023).............................................................................23, 24

NPR, *Lawmakers Push for Federal Prison Oversight After Reports of Inadequate
  Medical Care*, (December 12, 2023) ........................................................................24

U.S. Dep't of Justice, Office of the Inspector General Audit Division,
  *The Federal Bureau of Prison's Efforts to Manage Inmate Health Care*,
  ii-xix, 32-34 (2008)..................................................................................................23

Walter Pavlo, *Federal Bureau of Prisons' Medical Care Falls Short of Its Own
  Policy*, Forbes Magazine (April 19, 2022) .......................................................22, 23

COHEN WILLIAMS LLP

i

DEFENDANT PAUL RICHARD RANDALL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
HIS APPLICATION FOR RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE OR DETENTION

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Mr. Randall's custodial status plainly presents a life-or-death situation.  It is simply fiction to suggest otherwise.  Afflicted with a necrotic ulcer in his left heel from diabetic complications as well as diagnosed congestive heart failure, Mr. Randall has been essentially bedbound for the last month.  He cannot walk without assistance; he requires full-time assistive care; his doctors have connected him to an antibiotic IV drip which will remain in place for a minimum of five weeks; and he depends upon the constant supply of supplemental oxygen provided via an appendaged tank.  If his ulcer worsens, he likely will require amputation.  And his timeline for recovery—to the extent there will be a recovery—is, at best, uncertain.

Faced with a critically infirm 66-year-old man who cannot leave the hospital and who is at risk of losing his foot, the government submits that the interests of the United States are best vindicated by seeking Mr. Randall's indefinite detention.  At the prior hearing on this matter, the Government relied primarily upon a specious unaccounted-for-assets argument in support of its request for detention.  Upon reflection, the government's hasty arrest and written submission to this Court left many facts unaccounted for.  This brief addresses those omissions, provides additional sureties for the Court's consideration, and includes documented medical records that clarify the record for this Court.

At the outset, and as discussed more fully below, the government is not entitled to detain Mr. Randall.  The Bail Reform Act permits the government to seek detention only in certain inapplicable cases, and (as relevant here) when a defendant poses a serious risk of flight.  But Mr. Randall poses absolutely no risk of flight, let alone a serious one.  He has no foreign ties and does not possess a passport.  He has not left the Central District in more than a decade.  Despite his criminal record, he has never missed a court appearance, never absconded from supervision, and has voluntarily met with the government at its prosecutors' and agents' requests hundreds of times over the better part of a decade.

1

Further, though Mr. Randall knew of the general nature of the charges against him in this matter since at least November of 2023, when his house was raided by law enforcement, he still remained in the jurisdiction and self-surrendered to serve a prison sentence (at a minimum security camp) two months later.  Following his release, he complied with every condition of supervision and continued his exemplary record of appearing when asked to do so by law enforcement.  He hired counsel, sat for a proffer with the government, and did not contest the more than $20 million seized from him (ostensibly relating to the instant matter).  Indeed, Mr. Randall was arrested and brought to this Court for his initial appearance after voluntarily reporting to the probation office to sign paperwork.  But even if Mr. Randall possessed a passport, even if he wanted to deviate from his decades-long form of punctuality and reliability and become a fugitive— arguably, the world's sickest, most infirm fugitive, which he most certainly does not—he would not make it a day without checking himself in (or being checked in) to a hospital for treatment.

Nonetheless, assuming arguendo that the government is, in fact, entitled to a detention hearing, Mr. Randall should not be detained because he does not pose a clear and convincing danger to the community.  He has no history of physical violence or violent convictions.  Economic danger is rarely used as a justification to detain defendants, and in any event, Mr. Randall's most recent *proven* fraud conduct occurred in 2017, almost a decade ago.  To the extent Mr. Randall poses an economic danger to others, conditions exist that can prevent him from engaging in any fraudulent conduct— including restricting his access to phones and computers, prohibiting him from interacting with anyone in the pharmaceutical or healthcare industries, and placing him on home detention.

Finally, and perhaps most significantly, Mr. Randall's current and planned conditions of confinement create a situation where the Court *must* release him to avoid violating his constitutional rights.  First, the circumstances of Mr. Randall's pretrial detention amount to punishment, especially for an individual who has not been convicted

COHEN WILLIAMS LLP

of the alleged conduct.  Mr. Randall is currently shackled to a hospital bed at White Memorial Hospital.  He stares at the ceiling—nothing more, nothing less.  He has no access to literature or any form of recreation (televisions, magazines, or otherwise) and is not permitted visits or telephone calls—even by or from his family.  Second, Mr. Randall's right to counsel and due process are being violated on a continuing basis.  Because of spurious "safety" concerns, he cannot close the door to his hospital room to confer privately with counsel in a confidential setting, and his only request for a legal phone call took almost a week to fully approve.  He has not been permitted to retain his legal documents or notes, which were seized from him.  Additionally, at Federal Medical Center, Butner ("FMC Butner"), the planned site of his pretrial detention, Mr. Randall would be placed in a facility in North Carolina without any practical ability for counsel to visit him in-person.  It goes without saying that, the quality of care he would receive at FMC Butner is highly questionable at best.  Without release from detention, Mr. Randall's constitutional rights are essentially nonexistent.

For these reasons and those discussed below (including proposed additional sureties and medical records documenting his grave health conditions), the Court should order the forthwith release of Mr. Randall pending trial.  Alternatively, at a minimum, Mr. Randall respectfully submits that he should be temporarily released pursuant to 18 U.S.C. § 3142(i) in order to allow him to effectively confer with counsel and prepare for trial while this case remains pending.

## II.   PROCEDURAL BACKGROUND

Mr. Randall is charged via complaint with one count of Healthcare Fraud for allegedly defrauding California's Medi-Cal system.  ("Complaint," Dkt. No. 1.)  As charged, the sole count in the Complaint carries the potential for a maximum of ten years in prison.  18 U.S.C. § 1347(a).

The government executed the search warrant in connection with the conduct underlying the allegations in the present complaint in November 2023, prior to Mr. Randall self-surrendering to the Bureau of Prisons to serve his time in connection

3

with a tax offense to which he had pled guilty.[1]  Despite knowing of this criminal investigation prior to his self-surrender date, and despite the fact that he was in much better health than he is today, Mr. Randall made no efforts to flee—and the government showed absolutely no concern about his supposed risk of flight.  The same is true after Mr. Randall was released following service of his sentence.

The instant complaint was filed on June 17, 2025.  Between November 2023 and June 17, 2025, there were no material changes concerning Mr. Randall's risk of flight beyond the fact that he developed a necrotic ulcer in his heel that rendered him non-ambulatory.

Beginning several weeks ago, undersigned counsel for Mr. Randall made multiple efforts to contact the government regarding Mr. Randall's case.  On June 25, 2025, Assistant United States Attorney ("AUSA") Roger Hsieh finally asked defense counsel to provide dates and times for a call.  Counsel proposed a call on Friday, June 27.  Rather than respond, the government orchestrated Mr. Randall's arrest, without granting counsel the courtesy of a call or the chance for Mr. Randall to self-surrender (which he has done several times in the past and which prior counsel had offered).  On June 26, 2025, Mr. Randall was lured to visit his probation officer for the purported purpose of signing certain forms, and when he showed up—just as he has for every other requested meeting with any member of law enforcement and/or for every hearing before an officer of the Court where his presence was required for the last 14 years—Mr. Randall was taken into custody.  Because of the seriousness of his medical condition, Mr. Randall was not able to be processed in Orange County on June 26, 2025, and he was transported to Los

---

[1] Notably, while sentenced for that tax offense in April of 2023 and self-surrendering in January of 2024, the offense conduct for that conviction related to conduct dating back no more recently than 2017.

COHEN WILLIAMS LLP

1   Angeles on the morning of June 27, 2025.  Once in Los Angeles, he was transported to

2   White Memorial Hospital, where he has remained since.[2]

3       The initial pretrial services report in this matter dated June 27, 2025 recommended

4   Mr. Randall be detained due to the risk of economic danger he would pose to the

5   community if released.  However, pretrial services did not analyze whether a detention

6   hearing was warranted under 18 U.S.C. § 3142(f).  And importantly, it found that

7   Mr. Randall did not pose an unreasonable risk of flight.

8       The Court held a hearing on whether or not Mr. Randall should be detained on

9   June 27, 2025.  Mr. Randall appeared remotely by teleconference from the hospital due to

10  an ulcer in his foot that had become gangrenous; counsel submitted photos of the foot to

11  the Court and the government prior to the hearing.  At the hearing, the government

12  moved for detention on the basis that Mr. Randall posed both a serious risk of flight and a

13  serious risk of obstructing justice.  (Dkt. No. 5 at 4.)  The Court disagreed that

14  Mr. Randall posed a serious risk of obstructing justice.  Instead, the Court held that a

15  detention hearing and detention were warranted because Mr. Randall posed both a serious

16  flight risk and a danger to the community.  In justifying its ruling, the Court cited to the

17  alleged brazenness of Mr. Randall's conduct, his past history of fraud convictions, and

18  the existence of allegedly unaccounted for assets.  The Court further held that there were

19  no conditions or combination of conditions that could reasonably assure the safety of the

20  community or Mr. Randall's appearance in court.

21      Mr. Randall now comes before the Court based on new factual information and a

22  change of circumstances.  Specifically, Mr. Randall's counsel has obtained medical

23

24  ────────────────

25  [2] When the undersigned explained the seriousness of Mr. Randall's condition,
    government counsel indicated that Mr. Randall had previously been less than forthright

26  about a heart attack that Mr. Randall suffered while at FCI Lompoc.  Given the records
    now before this Court, the government's argument—based on opinon and without

27  supporting files (which the defense has since ordered)—is not well taken and, frankly,
    seems cruel.

28

DEFENDANT PAUL RICHARD RANDALL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
HIS APPLICATION FOR RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE OR DETENTION

1  records pertaining to his condition that counsel was unable to obtain in advance of the

2  prior hearing due to the lack of notice from the government and the hurdles necessary to

3  release medical records to third parties.  These medical records provide information

4  directly relevant to the assessment of whether Mr. Randall is a serious risk of flight, as

5  well as the assessment of whether there are a set of conditions that would reasonably

6  assure Mr. Randall's appearance and the safety of the community.  Moreover, the

7  restrictive and punitive nature of Mr. Randall's confinement (and potential future

8  confinement) have now become clear, realities which essentially prevent him from

9  meaningfully participating in his own defense.  Finally, Mr. Randall now proposes using

10 his primary residence and family home as collateral for a bond and has obtained two

11 additional sureties, his sons, Sean and Andrew Randall, in addition to the previously-

12 proffered surety, Mark Randall.  Collectively, the new bond proposed should more than

13 assure the Court that there are a set of bond conditions the Court can set that would

14 reasonably assure Mr. Randall's appearance and the safety of the community.

### III.    LEGAL STANDARD

15

16      "[F]ederal law has traditionally provided that a person arrested for a noncapital

17 offense shall be admitted to bail."  *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th

18 Cir. 1985) (citations omitted).  "Only in rare circumstances should release be denied,"

19 and "[d]oubts regarding the propriety of release should be resolved in favor of the

20 defendant."  *Id.* (citations omitted).  "The Fifth and Eighth Amendments' prohibitions of

21 deprivation of liberty without due process and of excessive bail require careful review of

22 pretrial detention orders to ensure that the statutory mandate has been respected."  *Id.*  "In

23 our society, liberty is the norm, and detention prior to trial . . . is the carefully limited

24 exception."  *United States v. Salerno*, 481 U.S. 739, 755 (1987); *United States v. Orta*,

25 760 F.2d 887, 891 (8th Cir. 1985) ("The wide range of restrictions available ensures, as

26 Congress intended, that very few defendants will be subject to pretrial detention.");

27 *United States v. Chen*, 820 F. Supp. 1205, 1208 (N.D. Cal. 1992) ("The government's

28 burden of proof is not trivial.").

COHEN WILLIAMS LLP

Consistent with those constitutional principles and the intent expressed in the legislative history, the statutory scheme of the Bail Reform Act of 1984 favors release over pretrial detention. The Act provides that the government is not entitled to a detention hearing simply because they find it desirable that the defendant be detained; instead, there are only six instances that merit a detention hearing:

1) Cases involving crimes of violence;
2) Cases involving a maximum sentence of life imprisonment or death;
3) Cases involving serious drug offenses;
4) Cases involving recidivist offenders convicted of the above offenses;
5) Cases involving a serious risk of flight; or
6) Cases involving a serious risk that a defendant will obstruct justice.

18 U.S.C. § 3142(f)(1)-(2); *see also United States v. Ploof*, 851 F.2d 7, 10 (1st Cir. 1988). Critically, courts have universally held that the danger a defendant poses to the community—whether it be physical or economic—***cannot justify a detention hearing and is irrelevant until a hearing is warranted***. *See, e.g.*, *Ploof*, 851 F.2d at 11; *United States v. Himler*, 797 F.2d 156, 160 (3d Cir. 1986); *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988) ("The Bail Reform Act does not permit detention on the basis of dangerousness in the absence of [the 3142(f) factors].”); *United States v. Byrd*, 969 F.2d 106, 110 (5th Cir. 1992) ("[A] defendant's threat to the safety of other persons or to the community, standing alone, will not justify pre-trial detention.").

Even in cases where the Bail Reform Act permits a detention hearing, its terms still encourage the release of the average defendant on reasonable terms and conditions. The Act provides, first, that a defendant *shall* be released on a personal recognizance bond unless (1) the defendant represents a flight risk, or (2) presents a danger to the community. 18 U.S.C. § 3142(b). If a court determines that a personal recognizance release is not sufficient to reasonably assure appearance or will endanger a specific person or the community, the Bail Reform Act nonetheless mandates release subject to conditions. 18 U.S.C. § 3142(c). The conditions must be "the least restrictive further condition, or combination of conditions" necessary to "reasonably assure" the person's

7

COHEN WILLIAMS LLP

1  appearance.  18 U.S.C. § 3142(c)(1)(B).  Absolute certainty or a guarantee of appearance

2  is not required.  *Orta*, 760 F.2d at 890-92.  Importantly, "[t]he structure of the statute

3  mandates every form of release be considered before detention may be imposed."  *Id* at

4  892.

5        When a judicial officer has previously ordered a defendant detained at a bail

6  hearing, the hearing "may be reopened … at any time before trial if [a] judicial officer

7  finds that information exists that was not known to the movant at the time of the hearing

8  and that has a material bearing on the issue whether there are conditions of release that

9  will reasonably assure the appearance of such person as required and the safety of any

10 other person and the community."  18 U.S.C. § 3142(f).  At its discretion, this Court also

11 has authority to conduct a new hearing on the issue of detention even without the

12 presentation of new information.  *See* 18 U.S.C. § 3145(b) ("If a person is ordered

13 detained by a magistrate judge … the person may file, with the court having original

14 jurisdiction over the offense, a motion for revocation or amendment of the order.  The

15 motion shall be determined promptly.").

16                          **IV.    ARGUMENT**

17 **A.    Mr. Randall's New Bond Proposal and Additional Information About His**

18      **Medical Needs and Conditions of Confinement Warrant Reconsideration of**

19      **Bail.**

20        Mr. Randall respectfully requests that this Court order his release in this case

21 because a combination of conditions now exists that will reasonably assure his

22 appearance and preserve the safety of any other person and the community.  Mr. Randall

23 proposes that he be released from custody with the following property and sureties used

24 as collateral to assure his appearance and the safety of the community:

25        • A property bond utilizing Mr. Randall's primary residence located at 7418

26           East Grovewood Lane, Orange, CA 92869.  This property is legally owned

27           by Kenneth Jacobsen, a trustee of the Randall family trust.  The property is

28           encumbered by a mortgage of about $3,400,000, and real estate sources

COHEN WILLIAMS LLP

online[3] estimate the value of the home at $5,400,000, meaning there is about $2,000,000 of equity in the home.

- An unsecured bond in the amount of $140,000. This unsecured bond would be sourced in various amounts by Mr. Randall's three sons: Mark Randall (in the amount of $100,000), Sean Randall (in the amount of $20,000), and Andrew Randall (in the amount of $20,000).

This bail package, or one similar to it, is sufficient to reasonably assure Mr. Randall's appearance at trial and the safety of the community in light of his personal characteristics and the nature of the offense. Because these new sureties and properties have a material bearing on the issue of release, reopening the hearing is appropriate. 18 U.S.C. §3143(f); *United States v. Ward*, 63 F. Supp. 2d 1203, 1207 (C.D. Cal. 1999) (explaining that request to reopen detention hearing was merited because "the collateral that Kazarian's immediate family and relatives are offering to secure an appearance bond for his release does have a material bearing on whether there is a condition of release that will reasonably assure his appearance at trial").

Furthermore, the hearing should also be reopened because of new information regarding Mr. Randall's poor health and conditions of confinement. Since his initial hearing, counsel has obtained medical records that verify and detail the extent of Mr. Randall's necrotic ulcer and the presence of other serious underlying health conditions. The records make clear that Mr. Randall's wound is among the most severe, that there is necrotic tissue in his wound and the presence of gangrene, and that Mr. Randall is non-ambulatory. The records also state that Mr. Randall's time of discharge is uncertain due to the complexity and severity of his injury, which is being treated with intravenous antibiotics provided through a drip that is anticipated to continue for five weeks. Additionally, Mr. Randall's doctor has explained that Mr. Randall will

---

[3] Available at https://www.zillow.com/homedetails/7418-E-Grovewood-Ln-Orange-CA-92869/25176868_zpid/.

DEFENDANT PAUL RICHARD RANDALL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS APPLICATION FOR RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE OR DETENTION

COHEN WILLIAMS LLP

need to remain on supplemental oxygen provided through a nasal tube and oxygen tank for a period of unlimited duration.  Finally, and perhaps most significantly, the records confirm that Mr. Randall has been diagnosed with congestive heart failure—a factor further impeding his recovery from his foot injury and posing an independent risk to his life if ordered detained.

In addition to receiving medical records detailing Mr. Randall's condition, counsel has also had the opportunity to visit Mr. Randall and observe the conditions of his confinement at White Memorial Hospital.  While there, counsel has observed that Mr. Randall's current detention conditions are significantly worse and more punitive than imposed on the average federal detainee, and that Mr. Randall is being denied or hindered in his basic rights to make legal phone calls, receive and retain legal mail pertaining to his case, and have confidential conversations with counsel.  Both the new medical information obtained by counsel and counsel's observations serve as independent bases for reopening the issue of detention.  *See United States v. Orozco*, No. 2:18-CR-00104-KJM, 2020 WL 2745694, at *2 (E.D. Cal. May 27, 2020) (reopening hearing on the basis of new information that could materially alter the bail analysis).

**B.    The Government Is Not Entitled to Request Detention Because Mr. Randall Does Not Pose a Serious Risk of Flight.**

In order to be entitled to a detention hearing under the Bail Reform Act, the government must satisfy one of the six prerequisite conditions in § 3142(f).  *See* 18 U.S.C. § 3142(f)(1)-(2).  If the government fails to establish that a detention hearing is warranted under § 3142(f), Mr. Randall *must* be released on reasonable terms and conditions.  *Id.*; *see also United States v. Wasendorf*, No. CR12-2021, 2012 WL 4052834, at *7 (N.D. Iowa Sept. 13, 2012) (concluding that "[d]efendant's pretrial detention is not authorized under section 3142(f)(2)(A), [so] he must be released" and setting certain conditions of release).  Because Mr. Randall is charged with healthcare fraud and does not have the requisite criminal history to trigger a detention hearing under § 3142(f)(1), the government is only entitled to a detention hearing if it can establish that

10

COHEN WILLIAMS LLP

1  he poses a serious risk of flight if released.  *See* 18 U.S.C. §3142(f)(2)(A).  The

2  government cannot come close to making that showing.

3      The Bail Reform Act imposes a heavy burden on the government in proving that a

4  detention hearing is warranted based on a serious risk of flight: the government must

5  establish "by a clear preponderance of the evidence" that a person accused of a crime

6  poses a *serious* flight risk and that "no condition or combination of conditions will

7  reasonably assure [the person's] appearance."  *Motamedi*, 767 F.2d at 1406-07.

8  Ordinarily, factors that support a finding of serious flight risk include the use of aliases or

9  fake passports, unstable residential ties to a community, efforts to avoid arrest or

10  detection, the manipulation and concealment of assets, or previous attempts or planning

11  to flee the country.  *United States v. Giordano*, 370 F. Supp. 2d 1256, 1264 (S.D. Fla.

12  2005) (collecting cases).

13      Here, Mr. Randall does not pose an ordinary flight risk—let alone a *serious* one.

14  For one, Mr. Randall has extraordinarily strong ties to the Central District: he has resided

15  intradistrict for over sixty years, and has not left the Central District in over a decade.  He

16  owns his residence in the district (which he now offers as collateral for his release) and he

17  resides with his son and his son's family, including his three grandchildren.  *See United*

18  *States v. Caro*, No. 05 CR 858, 2005 WL 8160735, at *4 (N.D. Ill. Nov. 2, 2005) ("[The]

19  defendant has reasons to stay and not flee.  He has a home, two U.S. citizen children and

20  a U.S. citizen wife[.]") (citations omitted).  He is in regular contact with extended family

21  who also reside within the United States, strengthening his ties to the community.  *See*

22  *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("'[C]ommunity' in [the

23  Bail Reform Act] embraces both the community in which the charges are brought and

24  also a community in the United States to which the defendant has ties.").).

25      Moreover, Mr. Randall has no ties to a foreign country or any history of foreign

26  travel.  His passport was seized in 2011 and has remained in the possession of the

27  government since that time, and he thus has no way to leave the country through a port of

28  entry.  *See United States v. Xulam*, 84 F.3d 441, 443 (D.C. Cir. 1996) ("On a more

11

1  practical level, the government has taken away all [the defendant's] passports and travel

2  documents, so it is unlikely he could go far even if he wished to.").

3      Nor do Mr. Randall's personal characteristics suggest he is prone to missing court.

4  He does not abuse controlled substances, he has no record of mental health issues or

5  instability, and his physical issues (discussed further below) actually anchor him to the

6  district due to his need for medical treatment and lack of mobility. *See United States v.*

7  *Molina-Orantes*, No. 3:25-CR-00079-AN, 2025 WL 1177654, at *10 (D. Or. Apr. 23,

8  2025) ("The pretrial services report notes no substance abuse, mental health, or physical

9  health issues that may increase the risk of flight."). These mitigating personal

10  characteristics distinguish Mr. Randall from defendants who pose a risk of

11  nonappearance.

12      This Court need not rely on Mr. Randall's word alone to believe that he will appear

13  for the proceedings in this case. Despite his criminal record, Mr. Randall has *never*

14  absconded from the jurisdiction of probation, pretrial services, or the courts. He has

15  *never* failed to appear in court—whether intentionally or unintentionally—and has

16  consistently appeared for every hearing he has been ordered to attend. *See United States*

17  *v. Dodge*, 842 F. Supp. 643, 645 (D. Conn.) ("Although [the defendant] has a criminal

18  record stretching back several years, it does not appear that he ever has been charged with

19  failure to appear."). Further, Mr. Randall responsibly and timely met with the

20  government hundreds of times across many years to assist the government in ongoing

21  criminal investigations—and he *never* missed a meeting. Whether Mr. Randall was

22  ordered by a court or asked by the government, he has never failed to appear and answer

23  the allegations against him when asked. And Pretrial Services noted that Mr. Randall has

24  been compliant with his supervision conditions since being released on probation, and

25  that the present allegations involve conduct that occurred prior to Mr. Randall being

26  placed on supervision. Indeed, even after the government executed a search warrant at

27  Mr. Randall's home in November 2023, Mr. Randall *still* self-surrendered to serve his

28

DEFENDANT PAUL RICHARD RANDALL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
HIS APPLICATION FOR RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE OR DETENTION

1   sentence in connection with his tax offense.  His conduct is wholly inconsistent with

2   someone who is a *serious* risk of flight.

3       Significantly, even if Mr. Randall wished to flee the Court's jurisdiction (he does

4   not), he lacks the practical ability to abscond and evade the authorities due to his

5   critically poor health.  Diabetic ulcers have caused Mr. Randall's left heel to become

6   gangrenous and necrotic down to the bone.  Prior to his initial appearance, the USMS had

7   to place him in a hotel room under armed guard because of the timing of his arrest and an

8   inability to place him in a suitable BOP facility.  He was later transferred to White

9   Memorial Hospital in downtown Los Angeles due to his poor condition, where he

10  appeared remotely by telephone during his first hearing.  Counsel has since visited him

11  multiple times in-person at the hospital, where he has remained bedridden and under

12  twenty-four-hour guard in the days since his hearing.  Mr. Randall's ulcer is so severe

13  that the Marshals have indicated he cannot be placed at a standard BOP facility if ordered

14  detained.  Instead, they must transfer him to a Federal Medical Center, likely Butner, a

15  BOP-run hospital in North Carolina, to continue receiving medically-necessary treatment

16  upon discharge from the hospital.[4]

17      Contrary to the government's unsupported insinuation at the last hearing in this

18  matter, Mr. Randall is not malingering—and it's not even close.  Medical records

19  obtained from his doctors confirm the seriousness of his condition.  Those records detail

20  that Mr. Randall has been suffering from the diabetic ulcer since March 1, 2025, and that

21  he underwent revascularization at Saint Jude Hospital on April 18, 2025 to restore blood

22  flow to his left heel.  The procedure was not successful, and Mr. Randall was admitted to

23  the hospital on June 6, 2025 with a wound more than 40 square centimeters in size and 40

24

---

25  [4] The Court was absolutely right that *if* the Government is able to prove the instant
26  allegations, Mr. Randall's behavior would and should most appropriately be called
    brazen.  And the current paradigm for Mr. Randall to fight the charges is simple:
27  correspond with attorneys 3,000 miles away through coordination with a lawyer for the
    BOP.
28

DEFENDANT PAUL RICHARD RANDALL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS APPLICATION FOR RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE OR DETENTION

cubic centimeters in volume.  Doctors have diagnosed his diabetic ulcer as gangrenous and rate it a Grade 4 ulcer on the Wagner scale—a rating that confirms part of his foot has become necrotic.  Doctors have treated his wound with debridement of both skin and underlying muscle and hyperbaric oxygen therapy ("HBOT")—the latter of which is no longer available to Mr. Randall because White Memorial does not offer the treatment.  He was largely confined to his bed pre-detention, and he is not supposed to bear any weight on his left foot—which he was required to do when arrested.  He is presently on a five-week antibiotic IV drip to treat an infection in his tissue.

Despite months of treatment, Mr. Randall's wound has remained basically unchanged in size and appearance despite several weeks of intensive care in the hospital.  This is very likely due not only to the severity of his diabetes, but the fact that (as his medical records confirm) Mr. Randall suffers from congestive heart failure.  Because his heart does not pump enough oxygen to the rest of his body, Mr. Randall both struggles to breathe and heal from wounds at a normal pace.  Due to his condition, he needs constant supplemental oxygen delivered through tubes in his nose via an oxygen tank.  Mr. Randall's doctors informed counsel that Mr. Randall must remain at White Memorial Hospital for a minimum of 40 additional days, and his date of discharge remains uncertain.

Given the extent of his injury and his general medical condition, Mr. Randall's prospects as the least successful fugitive in history seem bright—in the unlikely event he was suddenly inspired to flee the Court's jurisdiction.  He cannot walk or bear any weight on his legs.  He is suffering from a serious, open wound that requires intensive care that includes a sterile environment, daily dressing changes, regular debridement, and a hyperbaric chamber to treat.  He must carry an oxygen tank with him because his heart is not capable of supplying enough oxygen to his body on its own.  If his ulcer worsens in grade and expands to the rest of his foot, he could require amputation.  Assuming Mr. Randall is even capable of boarding a flight out of the country or crossing the border by car in his current state, and assuming he was able to do so without his passport, he

14

COHEN WILLIAMS LLP

1  would not be able to travel far before needing medical attention from a doctor.  His

2  ability to hide from or avoid detection by authorities is limited at best.  In light of

3  Mr. Randall's critical health condition, his lack of access to a passport, his significant ties

4  to the district, and his consistent and perfect track record of appearing in court, he poses

5  no real risk of flight—let alone a *severe* one.

6         To counter the complete lack of apparent flight risk that Mr. Randall presents, the

7  government has historically pointed to three aggravating factors.  None have merit.  *First*,

8  the government has harped on the *alleged* brazenness of Mr. Randall's *alleged* conduct

9  and the potentially lengthy sentence he faces as a reason to find a serious risk of flight.

10  But "[i]n cases where only a serious risk of flight is at issue under § 3142(f)(2), it is

11  generally accepted that more than evidence of the commission of a serious crime and the

12  fact of a potentially long sentence is required to support a finding of serious risk of

13  flight."  *Giordano*, 370 F. Supp. 2d at 1264; *see also Friedman*, 837 F.2d at 50 ("In other

14  cases concerning risk of flight, we have required more than evidence of the commission

15  of a serious crime and the fact of a potentially long sentence to support a finding of risk

16  of flight.").  Just as importantly, it is not actually true that the chances of a lengthy

17  sentence will incentivize Mr. Randall to abscond: Mr. Randall has been aware of the

18  investigation since November 2023, and his previous lawyer was in communication with

19  the government about these allegations for months.  During that time, after becoming

20  aware that he may be indicted again, Mr. Randall was easily capable of fleeing or

21  absconding from supervised release—but he did not.  Instead, Mr. Randall self-

22  surrendered to serve his sentence *after* the government executed the search warrant and,

23  since being released from prison six months ago, Mr. Randall has not only remained in

24  the Central District, but has remained entirely in compliance with the terms of his

25  supervision.  *See United States v. Garcia*, No. CR 13-0601-JST (KAW), 2014 WL

26  1478902 (N.D. Cal. Apr. 14, 2014) (defendant's prior knowledge of investigation

27  relevant factor in determining release appropriate); *see also United States v. LaLonde*,

28  246 F. Supp. 2d 873, 875 (S.D. Ohio 2003) ("Defendant has not seized upon previous

15

COHEN WILLIAMS LLP

opportunities to flee to avoid prosecution or incarceration, and the opportunities have been many.  The fact that the potential penalty may be much more severe in this case than in previous cases does not persuade the Court that Defendant poses such a serious flight risk that only detention will reasonably assure his appearance at trial.").

Critically, Mr. Randall is also presumed innocent at this stage.  The determination of whether to release a person prior to trial is not a determination of guilt or innocence; rather, a defendant is always presumed innocent unless and until the moment of conviction.  18 U.S.C. § 3142(j); *Stack v. Boyle*, 342 U.S. 1, 4 (1951) ("Unless th[e] right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.").  And to the extent the government does proffer or produce evidence of guilt at this stage, courts universally hold that the weight of the evidence is the least important of the bail factors.  *Motamedi*, 767 F.2d at 1408.  Absent both the presumption of innocence and the rule that the weight of the evidence is accorded the least weight, almost *every* federal criminal defendant would be detained upon indictment.

*Second*, the government has previously pointed to Mr. Randall's wealth and unaccounted-for assets as a basis to find that he poses a serious flight risk.  But as to the allegedly unaccounted-for assets, the government has not yet provided any evidence that assets are unaccounted for, what is unaccounted for, whether those assets (if in the form of property) have been liquidated, and whether or not Mr. Randall has convenient access to those assets.  Whether or not unaccounted-for assets can pose a risk of flight depends greatly on the character of the assets left unaccounted, how many of those assets remain, and the fungibility and concealability of those assets.[5]

---

[5] The government's brief in support of detention was noteworthy for several omissions, including the fact that the government has already seized more than $20 million from Mr. Randall.  In other words, that $20 million seizure (in addition to the more banal stuff like Mr. Randall's 14-year history of cooperator) is an unaccounted-for fact in the government's pleading.

To the extent the government does prove that Mr. Randall has convenient access to liquidated assets, it has merely proven that Mr. Randall has a theoretical opportunity for flight. Yet the "[m]ere opportunity for flight is not sufficient grounds for detention." *Himler*, 797 F.2d at 162; *see also Giordano*, 370 F. Supp. 2d at 1264 (citing *Himler*, 797 F.2d at 162 and echoing the same principle). For that very reason, "[i]n economic fraud cases, it is particularly important that the government proffer more than the fact of a serious economic crime that generated great sums of ill-gotten gains [to warrant detention]." *Giordano*, 370 F. Supp. 2d at 1264. A defendant simply having access to significant funds (accounted for or unaccounted for) is not enough; evidence of strong foreign family or business ties as compared with the ties to this country is necessary to detain a defendant, especially in the face of a high monetary bond.

*Third*, the government has argued that because Mr. Randall has a history of repeated fraud convictions (some while under court-ordered supervision), he presents a flight risk because he has historically shown a disregard for court orders. Mr. Randall, the government contends, cannot be trusted to return to court if ordered to do so because he cannot be trusted to obey court orders generally. This argument simply does not withstand scrutiny because, setting aside his compliance with supervision since being released from prison six months ago, Mr. Randall has *never* failed to appear in court when ordered to do so. The government paints too broad of a brush by arguing that because Mr. Randall has violated one discrete condition of his release in the past, he is destined to violate unrelated conditions pertaining to flight in the future. Thus, setting aside how to characterize Mr. Randall's history of compliance with court orders, his prior violation of release terms—which were insufficient to require detention in Mr. Randall's subsequent tax case—have no actual bearing on his predisposition towards flight.

Lastly, if the Court does find that Mr. Randall poses some risk of flight, the substantial bond amount proposed—along with the potentially severe restrictions the Court can set on his freedom of movement and ability to alienate or transfer assets—is more than sufficient to reasonably assure his appearance. Because there is little

17

COHEN WILLIAMS LLP

suggesting that Mr. Randall poses any risk of flight, nothing suggesting he poses a serious risk of flight, and because conditions exist that can reasonably assure the Court that Mr. Randall will appear in court, the government was not and is not entitled to a detention hearing under § 3142(f)(2)(A) and Mr. Randall should be released.[6]

**C.    Mr. Randall Does Not Pose a Danger to the Safety of the Community.**

The government cannot establish that Mr. Randall is seriously at risk of fleeing while at liberty.  If it fails to make that showing, the inquiry ends, Mr. Randall is entitled to release, and any proof of Mr. Randall's dangerousness is irrelevant "[b]ecause [the Bail Reform Act] does not permit the detention of a defendant who does not satisfy any of the conditions of § 3142(f), regardless of his dangerousness to the community or to specific others."  *LaLonde*, 246 F. Supp. 2d at 875; *see also Himler*, 797 F.2d at 160.  But even if this Court were to find that a detention hearing is warranted and evidence of dangerousness is relevant, the government still cannot show that Mr. Randall poses an unreasonable risk of danger to the community.

To make such a showing, the government must do so by a heightened standard of clear and convincing evidence.  18 U.S.C. §3142(f); *Motamedi*, 767 F.2d at 1406.  Moreover, the government has not previously contended that Mr. Randall—an infirm and bedridden 66-year-old man charged with fraud and with no history of violence—poses a physical danger to the safety of the community.  Instead, the government has historically

---

[6] The government has also previously tried to justify a detention hearing by arguing that Mr. Randall poses a serious risk of obstructing justice pursuant to § 3142(f)(2)(B).  The Court rejected that argument at the time, and should do so again, for the government has not (and cannot) introduce any evidence that Mr. Randall poses any *future*, ongoing risk of obstructing justice.  *See United States v. Mercado*, 737 F. Supp. 3d 153, 159–60 (W.D.N.Y. 2024) ("'The question is… whether there is a serious risk of obstruction *in the future.*'") (quoting *United States v. Madoff*, 586 F. Supp. 2d 240, 250 (S.D.N.Y. 2009)) (emphasis added and removed); *see also Madoff*, 586 F. Supp. 2d at 250 ("[§ 3142], by its nature, is always looking forward.  To be sure, the Court should consider past behavior in assessing the likelihood of prohibited behavior in the future, but the government needs to show that there is a serious risk that these potential harms exist going forward.").

DEFENDANT PAUL RICHARD RANDALL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS APPLICATION FOR RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE OR DETENTION

argued (and is likely to argue again) that Mr. Randall solely poses an *economic* danger to the community.

Yet courts "rarely conclude that [an] economic harm presented rises to the level of a danger to the community for which someone should be detained," even in cases involving alleged loss amounts magnitudes larger than that alleged here.  *See Madoff*, 586 F. Supp. 2d 240, 253-54 (S.D.N.Y. 2009) (declining to detain Bernie Madoff on the basis that he posed an economic danger despite his alleged orchestration of the largest Ponzi Scheme in history).  Instead, most courts that acknowledge economic harm as a cognizable form of danger under the Bail Reform Act have instead detained defendants due to their risk of flight or the charging of an allegedly violent crime, not economic danger. *Id.* at 253 n.14.  This is likely because while economic crime is certainly worthy of concern, it is significantly more preventable and reversible than the effects of violent crime.  Forfeiture, restitution, and restrictions on phone and computer use can frequently prevent future economic crimes, limit their financial impact, and make victims whole; the human damage wrought by a murder, robbery, or assault is rarely repaired, limited, or prevented so simply.

The timing of these charges also has significant bearing on Mr. Randall's perceived danger.  The Government alleges that Mr. Randall engaged in healthcare fraud from May 2022 to April 2023 *prior* to serving a recent 23-month sentence in an unrelated tax fraud case.  Since his alleged criminal conduct, he has served time in prison, been released to his home, began a term of supervised release, and continued the long process of rehabilitating from his criminal conduct and reintegrating into the community.  He has been compliant with the conditions of his release and has not committed any new wrongdoing since being sentenced and released from custody.  The Government has not even attempted to detain him until now, despite knowing for months—both before and after his recent incarceration—that Mr. Randall was at liberty in the community and believing he committed the alleged crime in the instant matter.  Both the dated timing of

1    Mr. Randall's alleged conduct and the Government's delay in apprehending him belie the

2    claim that he poses an ongoing danger to the community.

3       Finally, much like with the flight inquiry, available bail conditions and the bond

4    package proposed to the Court serve as significant restraints on any economic danger

5    Mr. Randall's liberty might pose (if it poses any at all). Mr. Randall does not object to

6    any condition the Court may find necessary—including limiting or monitoring his phone

7    and computer use, forbidding him from involvement in the healthcare industry, and

8    restricting his freedom of movement. Mr. Randall also proposes that the Court set a bond

9    utilizing his multi-million dollar family home and his, his son's, and his grandchildren's

10   primary residence as collateral, in addition to setting an unsecured bond utilizing the

11   suretyships of his three sons in the amount of $140,000. In this context, the Court must

12   not only consider the significant amount of collateral at stake, but the sentimental worth

13   of the proposed bond: the deterrent effect of a bond is heightened when, like here, the

14   defendant's proposed bond involves property and assets belonging to close family

15   members. *United States v. Russe*, No. 10 CR 328-1, 2012 WL 3308623, at *3 (N.D. Ill.

16   Aug. 13, 2012) ("The threat of alienation of [] loved ones, in addition to the loss of their

17   property, forms the incentive for [a] defendant to uphold the terms of his bond."); *United

18   States v. Bernal*, 183 F. Supp. 2d 439, 441 (D.P.R. 2001) ("Defendant's close relationship

19   with the witnesses who are willing to provide bail for him should create a strong

20   incentive for him to comply with the conditions of release. Further, defendant is not

21   likely to place his close friends and relatives in the precarious position of having their

22   valued properties forfeited."). To the extent that the Court finds that Mr. Randall poses a

23   danger to the community at all, the significant amount of collateral proposed as a bond—

24   and the source of that collateral—offsets any potential risk.

**D.     Detaining Mr. Randall in His Current Physical Condition Violates His Right**

26         **to Counsel and Right to Due Process.**

27       Mr. Randall's release is required for an independent reason: his current detention

28   and inevitable placement out-of-state in FMC Butner will deprive him of both his Sixth

DEFENDANT PAUL RICHARD RANDALL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
HIS APPLICATION FOR RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE OR DETENTION

COHEN WILLIAMS LLP

Amendment right to counsel and his right to due process. "A defendant's right to counsel is central to our system of justice." *United States v. Garrett*, 179 F.3d 1143, 1147 (9th Cir. 1999) (en banc). The right to counsel embodies not only an independent constitutional right, but helps achieve due process by ensuring proceedings are imbued with a basic level of fairness. *See Holloway v. Arkansas*, 435 U.S. 475, 489 (1989) ("Assistance of counsel is among those 'constitutional rights . . . basic to a fair trial.'"). Moreover, when a defendant is detained pretrial in a criminal case, the Due Process Clause forbids all punishment during the defendant's status in custody. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished."). This prohibition on punishment for pretrial detainees includes prohibiting detention conditions that fail to provide reasonable safety for inmates, including access to adequate medical care. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989) ("[W]hen the State . . . so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.").

Presently, Mr. Randall is being held at White Memorial Hospital where meeting with his attorneys must occur with the door open and law enforcement officers standing right outside. Moreover, his legal papers were seized and have not been returned, including his copies of documents related to this case which contain his privileged notes and impressions for purposes of his legal defense. Without access to case documents or truly privileged meetings with counsel, Mr. Randall is deprived of his right to counsel, his right to due process, and his right to the attorney-client privilege.[7]

---

[7] It is also worth noting that Mr. Randall's conditions of confinement are much worse than what he would be subject to at a BOP facility. He has no access to his case documents; he is not allowed any phone calls or communications with loved ones; he is not allowed any non-legal visitation; he is not allowed any personal reading materials or

DEFENDANT PAUL RICHARD RANDALL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS APPLICATION FOR RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE OR DETENTION

If ordered detained, the Marshals have indicated that Mr. Randall would eventually be transferred to FMC Butner, a BOP-affiliated hospital in North Carolina, to receive further medical treatment while awaiting trial.  But placement in FMC Butner would violate Mr. Randall's constitutional rights in at least two different ways.  First, it would violate his right to counsel because Mr. Randall would be placed across the country from his counsel of choice, effectively preventing the lawyers at Cohen Williams LLP from preparing him for trial and effectively representing him.  It is practically and financially impossible for counsel to fly to and from North Carolina from Los Angeles in order to see Mr. Randall on a continuing basis, confer with him privately, and physically review document-heavy discovery with him.  This *de facto* prohibition on contact visits with Mr. Randall would effectively deprive him of effective assistance of counsel and the counsel of his choice.  *See Ching v. Lewis*, 895 F.2d 608, 610 (9th Cir. 1990) ("[A] prisoner's right of access to the courts includes contact visitation with his counsel.").

Second, subjecting Mr. Randall to pretrial detention violates his right to be free from punitive pretrial incarceration because no BOP facility can guarantee him access to adequate medical care.  On a broad level, the BOP has struggled for decades with staffing shortages that compromise their ability to deliver adequate healthcare to inmates and detainees.  *See* Walter Pavlo, *Federal Bureau of Prisons' Medical Care Falls Short of Its Own Policy*, FORBES MAGAZINE (April 19, 2022), available at https://www.forbes.com/sites/walterpavlo/2022/04/19/federal-bureau-of-prisons-medical-care-falls-short-of-its-own-policy/.  One senior medical personnel in an unnamed federal institution recently reported "[w]e [] have many diabetics[] … that have run out of medications and have no way of refilling them until they … [experience] emergent issues, or are lucky enough to communicate the need to executive staff, or custody staff who communicate it to Medical.…  There are currently OVER 750 unfilled

---

time outside of his hospital room.  Instead, he is chained to a bed all day with nothing else.

DEFENDANT PAUL RICHARD RANDALL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS APPLICATION FOR RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE OR DETENTION

prescriptions." *Id.* A staff member at another institution who submitted a plea for help to the Office of the Inspector General stated in writing that the state of healthcare in BOP facilities was "UNACCEPTABLE, DANGEROUS. Literally a powder keg awaiting an explosion." *Id.* (emphasis in original). Indeed, the Inspector General has warned that the BOP is failing to meet the basic healthcare needs of its inmates since at least 2008. *See* U.S. DEP'T OF JUSTICE, OFFICE OF THE INSPECTOR GENERAL AUDIT DIVISION, *The Federal Bureau of Prison's Efforts to Manage Inmate Health Care*, ii-xix, 32-34 (2008), available at www.justice.gov/oig/reports/BOP/a0808/final.pdf; *see also* U.S. DEP'T OF JUSTICE, OFFICE OF THE INSPECTOR GENERAL AUDIT DIVISION, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, (March 2016), available at https://oig.justice.gov/reports/2016/e1602.pdf ("[R]ecruitment of medical professionals is one of the BOP's greatest challenges and staffing shortages limit inmate access to medical care, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs.").

Even if placed in a specialized medical facility like FMC Butner, Mr. Randall's health and safety is not guaranteed. According to a recent investigative report, FMC Butner has been plagued by staffing shortages and delays in care much like other BOP facilities. *See* Meg Anderson, *1 in 4 Inmate Deaths Happens in the Same Federal Prison. Why?*, NPR (Sept. 23, 2023), available at https://www.npr.org/2023/09/23/1200626103/federal-prison-deaths-butner-medical-center-sick-inmates. And despite outwardly proclaiming a standard of care equivalent to independent hospitals, FMC Butner reportedly lacked appropriate medical accreditations as recently as 2023. *Id.* Alarmingly, the deaths of one-in-four BOP inmates have occurred while in custody at FMC Butner. *Id.* While an increased percentage of deaths at a facility designed to serve as a hospital should be expected, Butner has also been accused of failing to provide medically-necessary care to cancer stricken patients, neglecting to provide anti-seizure medications to epileptics, and delaying a necessary heart surgery for an infirm inmate for almost a year-and-a-half. *Id.* The investigative

COHEN WILLIAMS LLP

report into Butner was so alarming that it drew bipartisan attention from United States Senators, two of whom called for additional oversight of medical care in BOP facilities— oversight that was never put into place.  NPR, *Lawmakers Push for Federal Prison Oversight After Reports of Inadequate Medical Care*, (December 12, 2023), available at https://www.npr.org/2023/12/12/1218627629/lawmakers-push-for-federal-prison-oversight-after-reports-of-inadequate-medical-.

Given the continued inadequacy of BOP's medical treatment of detainees, subjecting Mr. Randall to pretrial detention in his current condition would, at best, impair his ability to effectively communicate with counsel and access discovery and, at worst, imperil his life.  In these circumstances, his detention would be punitive, effectively deprive him of counsel, and violate his constitutional rights; both due process and the right to counsel mandate his release.

**E.    In the Alternative, Mr. Randall Should Be Released Pursuant to 18 U.S.C. § 3142(i).**

In the alternative, if this Court does find that a detention hearing and detention is merited, Mr. Randall requests temporary release pursuant to 18 U.S.C. § 3142(i).  That section provides that, where a detention order has been issued, "a judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."  18 U.S.C. § 3142(i).

Here, Mr. Randall's poor health necessitates his release from custody in order to prepare for trial.  Without his release on bond, Mr. Randall will be transferred to FMC Butner, an out-of-state facility in North Carolina, making it virtually impossible for him to confer in-person with counsel as he prepares to defend himself against a charge that will require him to review and discuss allegations that are necessarily document and discovery-heavy.  In the likely event that a protective order is required, counsel will have the difficult (if not impossible) task of reviewing potentially thousands of pages of

DEFENDANT PAUL RICHARD RANDALL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS APPLICATION FOR RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE OR DETENTION

COHEN **WILLIAMS** LLP

documentary discovery with Mr. Randall by video in a hospital setting—something it is
unclear Butner has the technological capacity to provide for.  Other important aspects of
Mr. Randall's defense will be hampered by detention—including reviewing and
discussing plea offers and preparing to testify at trial.  Preparing Mr. Randall to defend
against the allegations against him is simply not practically feasible if Mr. Randall is
incarcerated on the other side of the country.

Given the burdensome and unusual conditions of confinement that Mr. Randall
faces if detained, his temporary release to prepare for trial is merited while he remains in
critical health and undergoes treatment for his ulcer.  This Court can determine if and
when his health improves by ordering Mr. Randall to provide periodic status updates to
the Court on Mr. Randall's health.  While detention is not warranted at all in this case, the
temporary release of Mr. Randall under § 3142(i) while he prepares his defense is
merited if the Court believes detention is necessary.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Mr. Randall respectfully requests that the Court grant
his motion and set reasonable conditions of bail so that he may be at liberty during the
pendency of this case.  In the alternative, Mr. Randall requests that the Court temporarily
release him pursuant to 18 U.S.C. § 3142(i) in order to allow him to prepare for trial and
attend to his family.  In either case, Mr. Randall requests that his release be granted
forthwith pending the execution of any property bond and affidavits of surety.

Dated:  July 7, 2025             **COHEN WILLIAMS LLP**


By:    *_/s/ Reuven L. Cohen_*
        Reuven L. Cohen
        Specially Appearing Attorney for Defendant
        Paul Richard Randall

25